# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| CAPITOL INDEMNITY CORPORATION, a Wisconsin corporation, <br><br> Plaintiff, <br><br> v. <br><br> ELSTON SELF SERVICE WHOLESALE GROCERIES, INC., an Illinois corporation, LORILLARD TOBACCO COMPANY, a Delaware corporation, CANSTAR (U.S.A.) INC., a Florida corporation, CAM-KAT, INC., an Illinois corporation, MASHOUR "MIKE" DUKUM, IBRAHIM DUKUM, and DAVID DUKUM, <br><br> Defendants. | No. 04 C 6536 <br><br> Judge Rebecca R. Pallmeyer |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff, Capitol Indemnity Corporation ("Capitol Indemnity"), seeks a declaratory judgment that it has no obligation to defend its insured, Elston Self Service Wholesale Groceries, Inc. ("Elston"), in a lawsuit alleging trademark infringement and fraud. In the underlying dispute, Lorillard Tobacco Company ("Lorillard") brought claims related to Lorillard's federally-registered trademarks against Elston; Elston's owner, Mashour Dukum ("Mike"); and two of Elston's employees, Ibrahim Dukum ("Ibrahim") and David Dukum ("David"). Capitol Indemnity filed its Third Amended Complaint for Declaratory Judgment ("Third Amended Complaint") on October 4, 2006, seeking certain declarations regarding its obligations under the parties' insurance contract. On March 6, 2007, Capitol Indemnity, on the one hand, and Elston, Mike, Ibrahim, and David (together the "Moving Defendants"), on the other hand, filed cross-motions seeking summary judgment. For the reasons explained below, each side's motion is granted in part and denied in part.

## FACTUAL BACKGROUND

### I.    The Underlying Litigation

The facts are taken from the parties' Rule 56.1 statements and are largely undisputed. Elston is in the business of distributing wholesale merchandise, including cigarettes. (Defs.' Resp. to Pl.'s 56.1 ¶ 17.) Between 1983 and 2003, Elston advertised and sold Newport cigarettes. (*Id.* ¶ 18.) In what the parties refer to as the underlying litigation, Lorillard alleges that certain of the cigarettes sold by Defendants were counterfeits–that is, cigarettes purporting to be genuine Newport brand cigarettes that were, in fact, knock-offs. (Pl.'s Resp. to Defs.' 56.1 ¶¶ 19-20.) To understand the parties' arguments that such a lawsuit is (or is not) covered by the insurance policy issued by Capitol Indemnity, a brief description of Defendants' marketing activities is useful. Between 1983 and 2003, Elston routinely sent advertising fliers to its customers. (Defs.' Resp. to Pl.'s 56.1 ¶¶ 19-20.) Those fliers, which always included an advertisement for Newport cigarettes, were sent as often as once every twelve days. (*Id.* ¶¶ 20-21.) Elston's printing contractor, Rapid Press, created these advertising fliers, using a list of product names and prices furnished by Elston and then printing that information and stock clip art on the fliers. (*Id.* ¶ 22.) The stock clip art Rapid Press supplied included an image of a Newport cigarette box, which was featured on the fliers in identical form between 1983 and 2003. (*Id.* ¶¶ 22-23.)

In early July 2003, federal marshals raided Elston and seized cigarettes. (Defs.' Resp. to Pl.'s 56.1 ¶ 12.) On or about July 9, 2003, Lorillard filed suit against Elston, alleging various violations of the Lanham Act, state trademark law, the common law of unfair competition, and state law of deceptive trade practices. (Pl.'s Resp. to Defs.' 56.1 ¶¶ 10, 12; *see also* Complaint, *Lorillard Tobacco Co. v. Elston Self Serv. Wholesale Groceries, Inc.*, No. 03 C 4753 (N.D. Ill. July 9, 2003).)[1] According to the parties in this insurance coverage dispute, Lorillard's claims arise from the alleged

---

[1]    The parties are engaged in discovery in that case, which is currently pending before Judge Joan B. Gottschall.

sale and offer for sale of counterfeit cigarettes bearing Lorillard's federal trademark registration: NEWPORT®. (Pl.'s Resp. to Defs.' 56.1 ¶ 13.) On October 20, 2004, Lorillard filed an Amended Complaint ("Lorillard Amended Complaint"), naming Mike, David, and Ibrahim (the owner of Elston and his two sons) as additional defendants. (Lorillard Am. Compl., Ex. 4 to Pl.'s 56.1; Defs.' Resp. to Pl.'s 56.1 ¶¶ 4-6.)[2] Lorillard contends that its cigarettes are held to strict quality control standards, contributing to Lorillard's reputation among smokers for quality and consistency. (Lorillard Am. Compl. ¶ 9.) Lorillard has allegedly spent "substantial time, effort and money in advertising and promoting cigarettes" under its federally registered trademarks, which it obtained to protect its reputation and investments. (*Id.* ¶¶ 10-11.) Lorillard accuses Elston and the Dukums of misappropriating Lorillard's federally registered trademarks as well as the goodwill associated with them. (*Id.* ¶ 14.) By selling and offering for sale counterfeit products bearing Lorillard's marks, Lorillard contends, Elston and the Dukums induced the public to purchase goods in the erroneous belief that they are authentic Lorillard goods, thus depriving Lorillard of sales. (*Id.* ¶¶ 15-17.) The Lorillard marks to which Lorillard refers in the underlying litigation include NEWPORT®, NEWPORT® (stylized), LORILLARD®, Spinnaker Design®, and NEWPORT and Design®. (*Id.* ¶ 11.)

In its Amended Complaint, Lorillard asserts that Elston and the Dukums infringed Lorillard's marks in violation of 15 U.S.C. § 1114(1) (Count I); falsely designated or misrepresented goods being sold in violation of 15 U.S.C. § 1125(a) (Count II); diluted Lorillard's marks in violation of 15

---

[2]     Capitol Indemnity has brought this lawsuit not only against Elston but also against Lorillard, Canstar (U.S.A.) Inc. ("Canstar"), Cam-Kat, Inc. ("Cam-Kat"), Mike, Ibrahim, and David. According to the governing complaint, Canstar is a Florida corporation and Cam-Kat is an Illinois corporation, and Defendants purchased all of the allegedly counterfeit cigarettes at issue from those entities. (Third Am. Compl. ¶¶ 4-5, 17.) In its Answer to the Third Amended Complaint, Lorillard states that Canstar and Cam-Kat were at one point incorporated, as asserted in the Third Amended Complaint, but now appear to have been abandoned. (Lorillard Ans. ¶¶ 4-5.) The record does not otherwise illuminate the role of Canstar and Cam-Kat in this litigation, including whether they are additional insureds under the Policy. In any case, only Elston, Mike, Ibrahim, and David have moved for summary judgment.

U.S.C. § 1125(c) and 765 ILCS 1036/65 (Counts III and IV, respectively); engaged in unfair competition in violation of Illinois common law (Count V); engaged in deceptive trade practices in violation of 815 ILCS 510/2 (Count VI); engaged in common law fraud (Count VII); and induced third parties, including other retailers, to commit fraud (Count VIII). (Lorillard Am. Compl. ¶¶ 26-77.) In the underlying litigation, Elston filed a third-party complaint, naming as third-party defendants Canstar and Cam-Kat and alleging that it purchased the allegedly counterfeit cigarettes from those two suppliers. (Third Am. Compl. ¶ 17.)

To remedy these alleged wrongs, Lorillard first seeks equitable relief: an injunction prohibiting further wrongful conduct by Elston and the Dukums and an order requiring Elston and the Dukums to deliver to Lorillard for destruction anything in their possession that bears the Lorillard marks, other than genuine Lorillard cigarettes. (Lorillard Am. Compl. ¶¶ 78-79.) Lorillard asks the court to direct Elston and the Dukums to file and serve upon Lorillard a report setting forth the manner and form of their compliance with these injunctive orders. (*Id.* ¶ 87.) In addiiton, Lorillard seeks an accounting and disgorgement of Elston's and the Dukums' profits from their allegedly wrongful conduct. (*Id.* ¶¶ 80, 84.) Lorillard also requests monetary relief: an award of attorneys' fees pursuant to 15 U.S.C. § 1117(a); treble damages as provided by 15 U.S.C. § 1117(b); statutory damages in lieu of actual damages as provided in 15 U.S.C. § 1117(c); and taxable costs of the action, including attorney's fees and interest. (*Id.* ¶ 81-83, 85.) And finally, Lorillard seeks an award of punitive damages, on the ground that Elston and the Dukums acted with oppression, fraud, or malice. (*Id.* ¶ 86.)

## II.    Insurance Coverage Dispute

This action involves only insurance coverage claims. Capitol Indemnity issued insurance policy number BP00044456 to Elston for the period from July 14, 2002 to July 14, 2003 (the "Policy"). (Defs.' Resp. to Pl.'s 56.1 ¶ 15; Certified Copy of Policy, Ex. 6 to Pl.'s 56.1.) On April 22, 2004, Elston submitted a claim for coverage under Capitol Indemnity's policy. (Defs.' Resp. to Pl.'s

56.1 ¶ 11.) Capitol Indemnity disclaimed any duty to indemnify or defend Elston in the underlying lawsuit on May 5, 2005. (Pl.'s Resp. to Defs.' 56.1 ¶ 27.) This disagreement gave rise to the instant litigation.

In the Policy, Capitol Indemnity committed to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury', 'property damage', 'personal injury' or 'advertising injury' to which this insurance applies." (Certified Copy of Policy at Form BP 00 06 01 97, p. 1 of 15.) The Policy affords Capitol Indemnity the right and duty to defend Elston against any suit seeking such damages but explicitly limits that right and duty to claims to which the insurance does apply. (*Id.*) The Policy defines advertising injury to include:

    a.    Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

    b.    Oral or written publication of material that violates a person's right of privacy;

    c.    Misappropriation of advertising ideas or style of doing business; or

    d.    Infringement of copyright, title or slogan.

(*Id.* at 11 of 15.)[3] The parties focus on the third and fourth definitions of an advertising injury and

---

[3]    The Policy also sets forth a definition of personal injury, which includes injury other than bodily injury arising from:

    a.    False arrest, detention or imprisonment;

    b.    Malicious prosecution;

    c.    The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, by or on behalf of its owner, landlord or lessor;

    d.    Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

    e.    Oral or written publication of material that violates a person's right of privacy.

(continued...)

whether either is relevant to this dispute.

The Policy also contains three exclusions that may be relevant here. First, the Policy contains an "intentional conduct" restriction, which dictates that the Policy's coverage does not apply to advertising injury "[a]rising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity." (Certified Copy of Policy at Form BP 00 06 01 97, p. 6 of 15.) Second, the Policy includes a "first publication" restriction: the insurance does not apply to advertising injury "[a]rising out of oral or written publication of material whose first publication took place before the beginning of the policy period." (*Id.*) Finally, the Policy contains a relief exclusion, specifying that it "covers only compensatory damages," and specifically excludes punitive damages, exemplary damages, or statutory damages. (Certified Copy of Policy at Form CBP 179 (12-00).) The relief exclusion recognizes that statutory damages can include multiple damages, costs, expenses, or attorneys' fees. (*Id.*) There is, however, one exception noted to this exclusion: if a suit brought against an insured seeks both compensatory and punitive or exemplary damages, Capitol Indemnity will "afford a defense" without rendering itself liable for the excluded punitive or exemplary damages. (*Id.*)

The parties disagree as to whether the underlying litigation is covered by the Policy protections. In its Third Amended Complaint, Capital Indemnity seeks six declarations: (1) The underlying lawsuit does not contain allegations that constitute advertising injury under the Policy; (2) The underlying lawsuit does not contain allegations that constitute personal injury under the Policy; (3) There is no coverage in the underlying lawsuit because every count of Lorillard's Amended Complaint alleged intentional acts or false publications; (4) The Policy contains no

---

[3](...continued)
(Certified Copy of Policy at Form BP 00 06 01 97, pp. 13-14 of 15.) Although their initial claim for coverage invoked the "personal injury" coverage afforded by the Policy, Defendants appear to have abandoned that claim; the Moving Defendants have made no argument that the injury Lorillard alleges is, in fact, personal injury. The court accordingly considers only whether the Lorillard Amended Complaint alleges advertising injuries.

coverage for the punitive or statutory damages Lorillard seeks; (5) The Policy contains no coverage for the equitable relief Lorillard seeks; and (6) The Policy's first-publication exclusion precludes coverage in this case. (Third Am. Compl.)

Now, Capitol Indemnity, on the one hand, and the Moving Defendants, on the other hand, have filed cross motions for summary judgment. For the reasons explained below, the court grants the Moving Defendants' motion for partial summary judgment and grants in part and denies in part Capitol Indemnity's motion for summary judgment.

## DISCUSSION

Interpretation of an unambiguous insurance policy is a question of law. *First Ins. Funding Corp. v. Fed. Ins. Co.*, 284 F.3d 799, 804 (7th Cir. 2002). Because the court's jurisdiction is based on diversity, state law determines the scope of insurance coverage. *Native Am. Arts, Inc. v. Hartford Cas. Ins. Co.*, 435 F.3d 729, 731 (7th Cir. 2006). Both sides agree that Illinois law governs the contract dispute. As Illinois courts have recognized, "the construction of an insurance policy is a question of law which is particularly appropriate for resolution by summary judgment." *Am. Freedom Ins. Co. v. Smith*, 347 Ill. App. 3d 1, 6, 806 N.E.2d 1136, 1139 (1st Dist. 2004). When construing the insurance agreement, Illinois law requires the court "to ascertain and give effect to the true intentions of the contracting parties." *First Ins.*, 284 F.3d at 804. To do so, "the court must look to the allegations in the underlying complaint and compare these allegations to the relevant coverage provisions of the insurance policy." *Native Am.*, 435 F.3d at 732 (quoting *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 393, 620 N.E.2d 1073, 1079 (1993)). The court considers the agreement as a whole "with due regard to the risk undertaken, the subject matter that is insured, and the purpose of the entire contract." *First Ins.*, 284 F.3d at 804 (citation omitted).

"In a duty-to-defend action, we begin with the deck stacked in favor of the insured." *Del Monte Fresh Produce N.A., Inc. v. Transp. Ins. Co.*, 500 F.3d 640, 643 (7th Cir. 2007). Accordingly,

Capitol Indemnity has a duty to defend if the facts of the Lorillard Amended Complaint fall within, "or even potentially within," the Policy's coverage provisions. *Native Am.*, 435 F.3d at 732. Moreover, if any part of the Lorillard Amended Complaint falls within the Policy's scope, Capitol Indemnity must provide a defense. *Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.*, 976 F.2d 1037, 1040 (7th Cir. 1992). When deciding whether coverage exists, the court must construe the allegations in the Lorillard Amended Complaint "liberally," resolving any doubt concerning coverage in favor of the insured. *Native Am.*, 435 F.3d at 732 (citing *Ill. State Med. Ins. Servs. v. Cichon*, 258 Ill. App. 3d 803, 808, 629 N.E.2d 822, 826 (3d Dist. 1994)). Thus, to the extent a contract provision is susceptible to reasonable alternative interpretations, it contains an ambiguity, and that ambiguity will be resolved in favor of Elston and against Capitol Indemnity. *First. Ins.*, 284 F.3d at 804-05.[4] But to the extent the policy terms are unambiguous, the court applies their "plain and ordinary meaning." *Id.* at 804; *Native Am.*, 435 F.3d at 732

## I. Advertising Injury (Count I)

The parties first dispute whether the injuries alleged in the Lorillard Amended Complaint constitute "Advertising Injuries," within the scope of the Policy. As described above, the Policy defines an advertising injury to include, among other possibilities, "[i]nfringement of copyright, title or slogan" or "[m]isappropriation of advertising ideas or style of doing business." (Certified Copy of Policy at Form BP 00 06 01 97, p. 11 of 15.) For the reasons explained here, the court concludes that the allegations in the Lorillard Amended Complaint potentially assert an advertising

---

[4] Capitol Indemnity appears to believe that this standard does not apply where an insurance carrier has filed a declaratory action regarding coverage. (Pl.'s Opp. at 3-4.) The court agrees with Capitol Indemnity that it proceeded properly by filing this declaratory action. *Employers Ins. v. Ehlco Liquidating Trust*, 186 Ill. 2d 127, 150-51, 708 N.E.2d 1122, 1134-35 (1999). In *Employers Insurance*, however, the Illinois Supreme Court employed precisely the test outlined above. *Id.* at 153, 708 N.E.2d at 1136. The Illinois Supreme Court nowhere suggests that an alternative standard should apply in a coverage action, instead focusing on the applicability of the estoppel doctrine where an insurer fails to file a coverage action. By filing this declaratory judgment action, Capitol Indemnity has preserved its equitable defenses—including estoppel. But Capitol Indemnity does not assert those defenses in this action, rendering *Ehlco* irrelevant.

injury under the Policy.  *See Native Am.*, 435 F.3d at 732 (if allegations in underlying litigation fall potentially within the scope of an insurance policy, an insurer's duty to defend is triggered).

## A.    Infringement of Title

### 1.    Prior Precedent

First, trademark infringement inflicts an advertising injury if it is a species of title infringement.  The Seventh Circuit has held that "the term 'infringement of . . . title' as used in the contract is broad enough to encompass claims of trademark infringement" as alleged in the Amended Complaint.  *Charter Oak Fire Ins. Co. v. Hedeen & Cos.*, 280 F.3d 730, 736 (7th Cir. 2002) (applying Wisconsin law).  In reaching this conclusion, the Seventh Circuit rejected contrary Sixth Circuit and Eighth Circuit precedent.  *Id.*  Specifically, the Sixth Circuit has held that the word "title" in this context refers only "to the non-copyrightable title of a book, film, or other literary or artistic work."  *Id.* (quoting *ShoLodge, Inc. v. Travelers Indem. Co.*, 168 F.3d 256, 259-60 (6th Cir. 1999)).  Months later, the Eighth Circuit adopted the *ShoLodge* reasoning.  *Id.* (citing *Callas Enters. v. Travelers Indem. Co. of Am.*, 193 F.3d 952, 956 (8th Cir. 1999)).  Although it recognized the holdings in *ShoLodge* and *Callas Enterprises*, the *Charter Oak* court declined to follow them. It noted that "title" infringement "is not a distinct, recognized offense."  *Charter Oak*, 280 F.3d at 736.  Canvassing some of its own prior rulings, the Seventh Circuit observed that title infringement "presumably" involves titles "of books, songs, products, services, and so forth."  *Id.* (citing *Curtis-Universal, Inc. v. Sheboygan Emergency Med. Servs.*, 43 F.3d 1119, 1124 (7th Cir. 1994)). In other words, the definition of "title" extends beyond the non-copyrightable title of a creative work. *Id.*  The Seventh Circuit had also held that, when the words copyright, title, and slogan are read together, "'title' refers to names and related trademarks."  *Id.* (citing *Zurich Ins. Co. v. Amcor Sunclipse N. Am.*, 241 F.3d 605, 609 (7th Cir. 2001)).  Building on these prior holdings,  the *Charter Oak* court concluded that title infringement refers to and includes trademark infringement.

*Charter Oak* applied Wisconsin rather than Illinois law, but Capitol Indemnity has not

suggested that there is any substantive difference between Wisconsin and Illinois law on this issue. Indeed, several courts within this circuit have held that title infringement does include trademark infringement. *See Cent. Mut. Ins. Co. v. StunFence, Inc.*, 292 F. Supp. 2d 1072, 1078 & n.5 (N.D. Ill. 2003) (majority trend is to recognize that title infringement includes trademark infringement, though the question remains undecided under Illinois law); *Auto Owners Ins. Co. v. LA Oasis, Inc.*, No. 2:04 CV 174, 2005 WL 1313684, at *6 (N.D. Ind. May 26, 2005) (applicable precedent and plain meaning of "title" require conclusion that trademark infringement claims trigger insurer's duty to defend); *Fidelity & Guar. Ins. Co. v. Kocolene Marketing Corp.*, IP 00-1106-C-T/K, 2002 WL 977855, *10 (S.D. Ind. Mar. 26, 2002) (applying Indiana law: "Philip Morris USA's claims for trademark . . . infringement arguably are covered by the Policy under the 'infringement of title' offense of the 'advertising injury' provision"); *First State Ins. Co. v. Alpha Delta Phi Fraternity*, No. 1-94-1050, 1995 WL 901452, at *12 (Ill. App. 1st Dist. Nov. 3, 1995) ("infringement of title or slogan can include trademark . . . infringement, and as such, is well suited for advertising liability coverage") (unpublished opinion). Following these holdings, the court believes that title infringement fairly refers to trademark infringement.

At a minimum, "the divergence of case law regarding whether trademark and trade dress infringement comes within the 'infringement of title' offense in standard CGL [commercial general liability] advertising injury provisions is indicative that the language is ambiguous." *LA Oasis*, 2005 WL 1313684, at *7 (citing *Kocolene*, 2002 WL 977855, at *11). Ambiguous language must be construed in favor of the insureds. *Id.*; *Native Am.*, 435 F.3d at 732. In light of governing case law, title infringement could include trademark infringement, and Capitol Indemnity is therefore bound to defend Lorillard's claims in the underlying litigation.

### 2. Insurance Industry's Intent

Challenging this conclusion, Capitol Indemnity urges that the insurance industry never intended to extend coverage to trademark infringement claims. (Pl.'s Mem. at 13-15.) For this

position, Capitol Indemnity relies on a Sixth Circuit case, *Advance Watch Company v. Kemper National Insurance Company*, where the court held that "[r]ecognition of trademark . . . infringement as a distinct category of actionable conduct is so common that the only reasonable assumption is that if [the insurer] had intended to provide coverage for such liability, the insurer would have referred to it by name in the policy, as it did in the case of 'infringement of copyright, title or slogan.'" 99 F.3d 795, 803 (6th Cir. 1996). In other words, the court held that, because trademark infringement was not specifically mentioned in the policy at issue in that case, it must have been intentionally excluded. This court, however, does not find *Advance Watch* or its analysis, which *Charter Oak* later rejected in large part, determinative on the question of the insurance industry's intent. *See Frog, Switch & Mfg. Co. v. Travelers Ins. Co.*, 193 F.3d 742, 747 (3d Cir. 1999) ("*Advance Watch* has been sharply criticized for ignoring the real contours of intellectual property litigation, which often proceeds under a bewildering variety of different labels covering the same material facts.").

More persuasive, in the court's view, is an analysis of the history surrounding words used in the insurance policy. The parties agree that the Insurance Service Office ("ISO"), which publishes standard insurance forms, drafted the Policy. In 1998, the ISO changed its definition of advertising injury in Commercial General Liability ("CGL") policies from "infringement of copyright, title or slogan" to "infringing upon another's copyright, trade dress or slogan in your 'advertisement.'" *StunFence*, 292 F. Supp. 2d at 1077; *see also* 6 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* (hereafter "*McCarthy on Trademarks*") § 33:5, at 33-10 to 33-11 (4th ed. 2007). The *StunFence* court found it "clearly significant" that the ISO did not include trademark infringement in its revised definition of advertising injury, particularly because the judicial trend had been to hold that the term "title" does include trademark infringement claims. *StunFence*, 292 F. Supp. 2d at 1078. The policy at issue in *StunFence*, however, was ISO's CGL Policy; the Policy in this case is a Business Owners Liability Policy. (Certified Copy of Policy at Form BP 00 06 01

11

97.) According to a copyright notice imprinted on the Policy, the ISO copyrighted that form policy in 1997. (*Id.*) The parties have provided no information regarding when the ISO most recently updated its Business Owners Liability Policy, or whether that updated version included a new definition of advertising injury. This leaves open multiple reasonable interpretations of the insurance industry's intent.[5] Construing all doubts in favor of the insured, *Pipefitters*, 976 F.2d at 1040, the court therefore finds that the insurance industry and/or the parties intended that the Policy would apply to trademark infringement claims.

### B. Misappropriation of Advertising Ideas

Even if trademark infringement did not constitute infringement of title, trademark infringement causes an advertising injury if it constitutes a misappropriation of Lorillard's advertising ideas or style of doing business. Thus, Capitol Indemnity must also defend the Defendants in the underlying litigation if trademark infringement is a misappropriation of advertising ideas or style of doing business. Under the "misappropriation" definition of advertising injury, "most courts have concluded that insurers have at least a duty to defend trademark infringement actions." 6 *McCarthy on Trademarks* § 33:7, at 33-18. It is true that not all courts have adopted this broader understanding of the misappropriation definition*, see id.*, but the court believes that the majority view is the better interpretation, and the one more likely to be adopted by the Illinois Supreme Court.

One court in this district, interpreting Illinois law, has held squarely that the "misappropriation" definition of advertising injury "encompasses claims for trademark infringement so long as there is a sufficient nexus between the injury and the injured party's advertising." *StunFence*, 292 F. Supp. 2d at 1079. In reaching its decision, the *StunFence* court relied on two

---

[5]     For example, if the ISO did not replace "trade dress" with "title" in Business Owners Liability Policies in 1998, in spite of its awareness of judicial trends, this might reflect an intent that the Business Owners Liability Policies (unlike CGL Policies) do cover trademark infringement claims.

other cases decided in this district. First, in *Flodine v. State Farm Insurance Company*, No. 99 C 7466, 2001 WL 204786, at *2 (N.D. Ill. Mar. 1, 2001), the court considered an insurance coverage dispute relating to claims that goods manufactured by Flodine in the underlying litigation falsely suggested that they were produced by an authentic Native American tribe. Flodine sought insurance coverage, but her insurer countered that the claims against Flodine and the department store that sold her goods did not allege misappropriation of advertising injury or title infringement committed in the course of advertising. *Id.* at *6.

Siding with Flodine, the court held that the claims against Flodine sufficiently alleged advertising injury. *Flodine*, 2001 WL 204786, at *11. The court noted that "allegations of trademark . . . infringement or 'passing off' usually come within the meaning of misappropriation of advertising idea or style of doing business because of their informational connotation." *Id.* at *8. In *Flodine*–as here–the insurance policy at issue articulated certain covered advertising injuries, including defamation, disparagement, invasion of privacy, and copyright/slogan infringement. *Id.* From this context, the *Flodine* court concluded that the policy extended to wrongs "related to speech or information." *Id.* Thus, the policy excluded coverage for patent infringement and trade secret theft claims, which are merely propagated, compounded, or contributed to by advertising. *Id.* To the extent trademark infringement was a wrong related to speech or information, however, the court found such a claim covered by the policy. *Id.* Because the speech or information connotation must be found for trademark infringement to constitute a misappropriation of advertising ideas or style of doing business, claims for "passing off" or trademark infringement were covered by the policy as long as "the injury for which coverage is sought [was] caused by the advertising offense itself." *Id.* at *9 (citation omitted). *Flodine* is directly relevant to this court's analysis. As in *Flodine*, the injury at issue in this case is directly caused–and not merely exacerbated–by the advertising.[6] Lorillard's

---

[6]     The *Flodine* court distinguished a trademark and trade dress infringement case in
(continued...)

Amended Complaint alleges that advertising and sale of falsely-labeled counterfeit cigarettes deprived Lorillard of sales, tarnished the Lorillard marks, and otherwise harmed Lorillard. In other words, the advertising itself was the wrongful and harmful conduct at issue in the underlying litigation.

The second case cited by the *StunFence* court involved insurance coverage for trade secret misappropriation. There, the court adjudicated an insurance coverage dispute arising out of underlying allegations that Winklevoss and another party misappropriated trade secrets from the underlying plaintiff's software program and used those misappropriated trade secrets to develop a competing product, which they sold to the underlying plaintiff's customers. *Winklevoss Consultants, Inc. v. Fed. Ins. Co.*, 991 F. Supp. 1024, 1027 (N.D. Ill. 1998). Among other issues, the court considered whether trade secret misappropriation can constitute a misappropriation of advertising ideas or style of doing business, sufficient to trigger the insurance policy at issue in that litigation. *Id.* at 1037-39. There, the court noted that the principles of Illinois insurance policy interpretation require the court to afford the phrase "misappropriation of advertising ideas or style of doing business" its broadest possible interpretation, so long as that interpretation is in keeping with the parties' expectations. *Id.* at 1038. The *Winklevoss* court found the most liberal interpretation of that phrase in *Lebas Fashion Imports of USA, Inc. v. ITT Hartford Insurance Group*,

_____

[6](...continued)
which the underlying defendant was accused of advertising and selling pens that imitated the trade dress, product design, and configuration of Cross pens. *Flodine*, 2001 WL 204786, at *8 (citing *Advance Watch*, 99 F.3d at 798). The advertising in *Advance Watch* was only wrongful because the product design had been copied; in other words, the injury itself was not informational in nature. *Id. See also Skylink Techs., Inc. v. Assurance Co. of Am.*, 400 F.3d 982, 985 (7th Cir. 2005) (finding no advertising injury under the misappropriation theory where Skylink sold universal transmitters and keypads that operate and claim to be compatible with Chamberlain garage door openers but negated a security feature of the Chamberlain product: "Chamberlain's complaint is not the result of Skylink's use of its name or those phrases on Skylink's packaging, it's the fact that Skylink's products bypass the rolling code technology"). In other words, courts must consider the underlying allegations rather than set forth a broadly applicable rule.

where a California court found that "misappropriation of advertising ideas or style of doing business" encompasses trademark claims. *Id.* at 1038 (citing 50 Cal. App. 4th 548, 562-63 (2d Dist. 1996)). The *Winklevoss* court noted that the *Lebas* court had "ascribed to the word 'misappropriation' its 'general meaning,'" which is "'to take wrongfully'" rather than interpreting the word in a "'technical common law sense.'" *Id.* (quoting *Lebas*, 50 Cal. 4th at 562). Because "one of the basic functions of a trademark is to advertise the product or services of the registrant," a trademark can be considered an "'integral part of an entity's 'style of doing business.'" *Id.* (quoting *Lebas*, 50 Cal. App. 4th at 562). The *Winklevoss* court concluded that although the reach of misappropriation did not extend so far as to include trade secrets, trademark infringement claims fit comfortably within it.

In another instructive case, the Southern District of Indiana evaluated the claims of an insured–Kocolene–for insurance coverage in a dispute Philip Morris filed against it in federal court. *Kocolene*, 2002 WL 977855, at *1. In that dispute, Philip Morris contended that Kocolene distributed and sold within the United States MARLBORO® cigarettes intended for sale in foreign countries. *Id.* at *3. Marlboro cigarettes offered for sale in the United States bear certain trademarked features, including the MARLBORO® mark and "roof" design on the packaging. *Id.* at *2. The cigarettes Kocolene distributed and sold were materially different from cigarettes Philip Morris sold in the United States: they did not contain Surgeon General warnings; did contain a legend marking them "U.S. Tax Exempt For Use Outside U.S.;" and did not contain "Miles," which is a program by which Philip Morris rewards loyal smokers and promotes the goodwill associated with its marks. *Id.* at *3. Kocolene was alleged to have manipulated the cigarettes' packaging to obscure these differences from Philip Morris' cigarettes designated for sale in the United States. *Id.* Kocolene defended and settled the claims against it at its own expense and then sought insurance coverage for the amounts it expended. *Id.* at *1. Ultimately, the *Kocolene* court noted that "the packaging, including the [trademarked] roof design, of the cigarettes arguably could be

considered an 'advertising idea'" and that, by repackaging the cigarettes intended for foreign sale, Kocolene caused the wrongful impression that they were selling domestic MARLBORO® cigarettes. *Id.* at *8. Thus, the court denied the insurer's motion for summary judgment. *Id.* at *15.

Some courts have disagreed, finding that the misappropriation definition of advertising injury does not encompass trademark infringement claims. *See Advance Watch*, 99 F.3d at 802 ("'misappropriation of advertising ideas or style of doing business' does not refer to a category or grouping of actionable conduct which includes trademark or trade dress infringement"); *Callas*, 193 F.3d at 957 (adopting *Advance Watch*). But the weight of compelling authority holds that trademark infringement under like circumstances may constitute misappropriation of advertising ideas or style of doing business. *See Adolfo House Distrib. Corp. v. Travelers Prop. & Cas. Ins. Co.*, 165 F. Supp. 2d 1332, 1339 (S.D. Fla. 2001) (characterizing *Advance Watch* as an "anomaly in the trend under the law"). Courts reaching that conclusion include several federal Courts of Appeals. *See Houbigant, Inc. v. Fed. Ins. Co.*, 374 F.3d 192, 202 (3d Cir. 2004) (distinguishing *Advance Watch* and holding "that the injury caused by the Insureds' infringement of . . . trademarks is an advertising injury."); *State Auto Prop. & Cas. Ins. Co. v. Travelers Indem. Co. of Am.*, 343 F.3d 249, 258 (4th Cir. 2003) ("the NISSAN trademark is an advertising idea and, as a consequence, the injuries alleged in the [underlying] Complaint fall within the [insurance policy's] definition of an 'advertising injury'"); *Peterson Tractor Co. v. Travelers Indem. Co.*, 156 Fed. Appx. 21, 23 (9th Cir. 2005) (district court correctly found that insurer had a duty to defend trademark infringement claim because "[t]his claim stated an advertising injury, either as a misappropriation of Peterson's advertising ideas . . . or as an infringement of title") (unpublished opinion). This court concludes that Lorillard's federal and state law trademark infringement claims at least potentially allege an advertising injury, thereby triggering Capitol Indemnity's duty to defend.

## C.     In the Course of Advertising

Even if a claim otherwise constitutes alleged "advertising injury," the Policy affords coverage

only if the advertising injury is "caused by an offense committed in the course of advertising [the insured's] goods[,] products or services," (Certified Copy of Policy at Form BP 00 06 01 97, p. 1 of 15). As the court understands this language, it is another way of articulating the causal nexus required for trademark infringement to constitute misappropriation of advertising ideas or style of doing business. According to Capitol Indemnity, the Moving Defendants merely sold and did not promote the allegedly counterfeit cigarettes. (Pl.'s Mem. at 11-13.) Based on this, Capitol Indemnity urges, Lorillard's claim of injury is not, in fact, an advertising injury.

In this circuit, actions taken in the course of advertising must involve "actual, affirmative self-promotion of the actor's goods or services." *Erie Ins. Group v. Sear Corp.*, 102 F.3d 889, 894 (7th Cir. 1996). Here, the Moving Defendants have made the requisite showing that they not only sold but also advertised the cigarettes. There is no dispute that Elston regularly circulated fliers featuring Newport cigarettes. Indeed, the fact that the cigarettes were labeled with the Newport mark could, itself, be considered advertising. In its ordinary meaning, advertising consists of "[t]he action of drawing the public's attention to something to promote its sale" or "[t]he business of producing and circulating advertisements." Bryan A. Garner, ed., *Black's Law Dictionary* (8th ed. 2004). One court has held that, if interpreted broadly, advertising could include a product's label and packaging, as there is "no requirement that the thing that draws attention to the product be separate from the product." *Flodine*, 2001 WL 204786, at *10.

Capitol Indemnity nevertheless contends that distribution of a flier with stock clip art supplied by Rapid Press is not causally connected to Elston's sale of counterfeit cigarettes, and therefore that it cannot constitute action taken in the course of advertising the cigarettes. (Pl.'s Mem. at 13.) Plaintiff is correct that, to trigger insurance coverage "there must be a causal connection between the advertising activity and the alleged advertising injury." *Global Computing, Inc. v. Hartford Cas. Ins. Co.*, No. 05 C 6753, 2007 WL 844618, at *3 (N.D. Ill. Mar. 14, 2007). As a result, "mere advertisement of an infringing product. . . fails to give rise to advertising liability." *Id.* at *3. But an

underlying complaint's allegation that the advertising in question, which included a company's logo, "were likely to cause confusion, mistake, or deception as to their source, origin, or authenticity" or that the advertising traded on a company's goodwill and business reputation, thereby injuring that company, are substantively different from bare allegations that a party advertised an infringing product. *Id.* at *4. In other words, it might be significant that the advertisements themselves–rather than merely the product–were wrongful. Ultimately, the *Global Computing* court did not reach the question of whether such allegations constitute an advertising injury because the policy at issue there contained an exclusion for advertising injuries resulting from trademark infringement. *Id.* The distinction the court made between merely advertising an infringing product and actually trading on the company's goodwill, thereby injuring that company, is nevertheless instructive. Here, Lorillard has alleged that Defendants did the latter. (*See, e.g.,* Lorillard Am. Compl. ¶¶ 13-15, 30, 42, 52.)

Similarly, the Seventh Circuit concluded in *Native American Arts* that a company perpetrated an advertising injury by selling goods falsely labeled as being authentically Native American, thereby trading on the Native American community's goodwill and reputation and injuring that community. In that case, Native American Arts ("NAA") accused Stravina Operating Company ("Stravina") of manufacturing and selling crafts and jewelry it falsely advertised as being authentically Native American. *Native Am.*, 435 F.3d at 730-31. As part of a settlement, Stravina assigned its rights under two insurance policies to NAA. *Id.* at 731. In NAA's action for breach of the duty to defend, the insurance companies argued that the coverage did not apply to NAA's claims, but the district court and Seventh Circuit concluded otherwise. By falsely suggesting that its crafts and jewelry were authentically Native American, Stravina "traded upon a reputation, history, and sales advantage that it did not deserve." *Id.* at 733. Stravina allegedly took sales away from the proper sellers. *Id.* And "the fact that NAA's complaints alleged that Stravina took advantage of NAA's 'advertising style' to effectuate its alleged violation of the Act should have put [the insurer] on notice that at least some of Stravina's actions may have caused an 'advertising

injury.'" *Id.* Ultimately, as in *Global Computing*, the *Native American Arts* court found that the insurance policy exclusions for advertising injury arising out of intellectual property right violations precluded coverage. *Id.*

In this case, Lorillard's Amended Complaint put Capitol Indemnity on adequate notice of an alleged advertising injury: Lorillard asserts that the Moving Defendants' "use of counterfeit symbols, logos, likenesses, and images is likely to cause confusion in the minds of the public." (Lorillard Am. Compl. ¶ 29.) Lorillard further asserts that this conduct "is intended to exploit the goodwill and reputation associated with the Lorillard Marks." (*Id.* ¶ 30.) Because Lorillard cannot control the allegedly counterfeit cigarettes, Lorillard alleges, "Lorillard's valuable goodwill in its trademarks is at the mercy of Defendant." (*Id.* ¶ 31.) In addition, this conduct allegedly deprived Lorillard of legitimate sales. (*Id.* ¶ 17.) These accusations remove the underlying complaint from the category of cases in which a complaint alleges no more than that the underlying defendant advertised an infringing product. Lorillard's contention that Elston and the Dukums traded on Lorillard's reputation, history, sales advantage, and goodwill, corresponds to the allegations found to describe an advertising injury in *Native American Arts*.

Indeed, some courts have suggested that trademark infringement allegations necessarily involve an injury perpetrated in the course of advertising. *See also Northam Warren Corp. v. Universal Cosmetic Co.*, 18 F.2d 774 (7th Cir. 1927) ("A trade-mark is but a species of advertising, its purpose to fix the identity of the article and the name of the producer in the minds of the people who see the advertisement, so that they may afterward use the knowledge themselves and carry it to others having like desires and needs for such article."); *Winklevoss*, 991 F. Supp. at 1036 (many courts have found that trademark infringement inherently involves advertising activity); *Flodine*, 2001 WL 204786 (same). Without addressing that issue, the court concludes that Lorillard's factual allegations at least potentially suggest that Lorillard suffered an advertising injury, thereby triggering Capitol Indemnity's duty to defend.

## II. Policy Exclusions

### A. Intentional Conduct (Count III)

The Policy contains three exclusions, each of which, according to Capitol Indemnity, negates any duty to defend it might have. First, the Policy provides that its coverage does not apply to advertising injury "[a]rising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity." (Certified Copy of Policy at Form BP 00 06 01 97, p. 6 of 15.) Capitol Indemnity argues that this Policy exclusion is applicable here and precludes coverage for Elston's fraudulent, knowing, and intentional torts. But the court need not consider which of Lorillard's claims might be excluded from the scope of the Policy by this provision, so long as at least one of Lorillard's claims falls within the Policy's scope. As discussed above, "because [Lorillard's] suit alleges several theories of recovery, [Capitol Indemnity] must provide a defense if any portion of the complaint falls within the terms of the policy." *Pipefitters*, 976 F.2d at 1040; *see also Valley Forge Ins. Co. v. Swiderski Elecs., Inc.*, 223 Ill. 2d 352, 363, 860 N.E.2d 307, 315 (2006) ("the insurer is obligated to defend its insured. . . even if only one of several theories of recovery alleged in the complaint falls within the potential coverage of the policy").

In this case, Lorillard has alleged theories of recovery that do not require it to prove that Elston acted intentionally, including, for example, many of its Lanham Act claims. As Lorillard itself has alleged in its Answer to Plaintiff's Third Amended Complaint for Declaratory Judgment:

> Lorillard states that its trademark claims, and related claims, are not "based" on intentional or knowingly false conduct. While Lorillard's complaint in the Underlying Action alleges willful conduct, that alleged conduct is not necessary for Lorillard to prevail on its claims, since willfulness is not a required element to determine liability of many of the claims and allegations set forth in the underlying complaint.

(Docket Entry No. 39 ¶ 39.) The court agrees: trademark infringement need not be willful to be actionable. For example, 15 U.S.C. § 1114, the basis of Lorillard's Count I, "does not uniformly require that infringements be committed with knowledge." *StunFence*, 292 F. Supp. 2d at 1081 (N.D. Ill. 2003). Although the Lorillard Complaint does include allegations that Defendants acted

intentionally, Lorillard need not prove that the Moving Defendants engaged in intentional or willful conduct to prevail. *Id.*; *Utica Mut. Ins. Co. v. David Agency Ins., Inc.*, 327 F. Supp. 2d 922, 927 (N.D. Ill. 2004); *Allied Ins. Co. v. Bach*, No. 05 C 5945, 2007 WL 627635, at *2 (N.D. Ill. Feb. 27, 2007) (intentional conduct exclusion does not absolve insurer of duty to defend because trademark infringement by marketing of counterfeit good need not be willful to be actionable). Thus, the intentional conduct exclusion does not relieve Capitol Indemnity of its owed a duty to defend.

**B.    First Publication (Count VI)**

The Policy also includes a "first publication" restriction, which excludes from its scope any advertising injury "[a]rising out of oral or written publication of material whose first publication took place before the beginning of the policy period." (Certified Copy of Policy at Form BP 00 06 01 97, p. 6 of 15) Capitol Indemnity contends that Elston's only true advertising was its sales fliers, which took place beginning in 1983, long before the Policy's coverage period began on July 12, 2002. (Pl.'s Mem. at 2-3.) Likewise, the packaging of the Newport cigarettes (both genuine and counterfeit) sold by Elston remained identical from 1983 through the end of the coverage period, on July 12, 2003. (*Id.* at 4-5.) Capitol Indemnity takes the position that "advertising is cumulative" and thus that the advertising commenced in 1983 helped to sell products years in the future by building name recognition, goodwill, and long-term customer habits. (Pl.'s Resp. to Defs.' Supp. 56.1 ¶ 2.) Accordingly, Capitol Indemnity contends–without citing a single case to support its position–that the first-publication exclusion bars coverage in this dispute. The particular question in this case is whether a party's non-infringing publication of a trademark can trigger the first-publication exclusion and void its insurance rights with regard to a later, infringing publication of that trademark. The court finds Capitol Indemnity's position impractical.

In one substantially similar case decided outside the jurisdiction, a court found it arguable that only *wrongful* prior publication should be considered when determining whether a first-publication exclusion applies. There, the insurers urged that a first-publication exclusion identical

21

to the one at issue here means "that any advertising injury caused by publication of material that has been published by the insured prior to the beginning of the policy period is not covered, even if the prior publication did not cause an injury." *Maddox v. St. Paul Fire & Marine Ins. Co.*, 179 F. Supp. 2d 527, 530 (W.D. Pa. 2001). Rejecting this argument, the court found that the language of a first- publication exclusion is reasonably susceptible to multiple interpretations. *Id.* It would also be reasonable for the exclusion to apply only where the prior publication caused the same injury as the later publication. *Id.* The *Maddox* court held that, "read in context, the phrase 'whose first publication' could be understood to refer not only to the word 'material' but also the injurious nature of that material." *Id.* The court found this interpretation reasonable because the purpose of a first-publication exclusion is to "prevent an individual who has caused an injury from buying insurance so that he can continue his injurious behavior." *Id.* Deeming the language of the exclusion ambiguous, the *Maddox* court construed those ambiguities in favor of the insured and found that the insurer did have a duty to defend. *Id.* at 530-31; *see also Dogloo, Inc. v. N. Ins. Co.*, 907 F. Supp. 1383, 1391 (C.D. Cal. 1995) (insurer has duty to defend where "the Court cannot say that any advertising published prior to the policy period caused the type of injury alleged in [the] Counterclaim" for misappropriation of trade secrets).

This holding is in keeping with Seventh Circuit precedent that a first-publication exclusion operates to preserve the purpose of insurance, which is to "spread risk." *Taco Bell Corp. v. Cont'l Cas. Co.*, 388 F.3d 1069, 1072-73 (7th Cir. 2004). Thus, the first-publication exclusion would apply if a defendant in an underlying lawsuit "during the period covered by [an insurance] policy just rebroadcast the commercials it had broadcast before" the coverage period. *Id.* at 1073. In such a case, the risk that an advertising campaign be deemed tortious has already materialized. *Id.* The risk is a certainty, and insurance serves no purpose. *Id.* But the first-publication exclusion "cannot save the insurer when the republication contains new matter that the plaintiff in the liability suit against the insured alleges as fresh wrongs." *Id.* Thus, in *Taco Bell*, the court found that a first-

publication exclusion did not apply where a defendant in underlying litigation published infringing images before the insurance policy coverage period began but published *different* infringing images, which appropriated new, protected ideas, during the coverage period. *Id.* In other words, the focus in *Taco Bell* is on when the risk of litigation arose.[7]

The court finds *Taco Bell* and *Maddox* consistent and instructive in this case, where the risk of litigation did not arise before the coverage period begins. As discussed above, between 1983 and 2003, Elston advertised and sold Newport cigarettes by mailing advertising fliers to its customer lists, and each flier included an advertisement for Newport cigarettes. (Defs.' Resp. to Pl.'s 56.1 ¶¶ 18-21.) Lorillard's claims against Elston and the Dukums allege that the Moving Defendants violated federal, state statutory, and state common law. (Lorillard Am. Compl.) Although the parties agree that Elston first began using the NEWPORT® trademark in its advertising in 1983–nearly twenty years before the coverage period, there is no way to know, at this stage, when Elston and the Dukums began selling the counterfeit cigarettes bearing the NEWPORT® trademark, or when the fliers that Lorillard alleges advertised those cigarettes were circulated. In other words, it is not clear when Lorillard claims that the infringing and fraudulent activity began. The parties explicitly disagree as to whether Elston "bought, displayed, marketed, or sold" the allegedly counterfeit cigarettes prior to the coverage period. (Pl.'s Resp. to Defs.' Supp. 56.1 ¶ 2.) Moreover, Capitol Indemnity has continually insured Elston since 1993. (Pl.'s Resp. to Defs.' Supp. 56.1 ¶ 3.) While advertising may be cumulative, the court doubts that advertisements circulated before Capitol Indemnity began insuring Elston in 1993 had a discernable impact in 2003. Thus, the court will not invoke the first-publication exclusion simply because Elston's advertising remained the same between 1983 and 2003.

---

[7]     Defendants also argue that the prior-publication exception applies only to tortious violations and not to trademark infringement. *See Maddox*, 179 F. Supp. 2d at 531 n.2 (collecting cases). The court need not reach this argument and therefore does not consider it

### C. Relief Sought (Counts IV and V)

Finally, the Policy clearly states that it "covers only compensatory damages." (Certified Copy of Policy at Form CBP 179 (12-00).)  In addition, the Policy explicitly excludes punitive damages, exemplary damages, and "[s]tatutory damages (such as multiple damages, costs, expenses or attorneys fees)." (*Id.*)  Capitol Indemnity contends that Lorillard does not seek compensatory damages and, therefore, that the Lorillard claim does not fall within the Policy's scope.  Because the Policy only requires Capitol Indemnity to defend Elston against lawsuits to which the insurance applies (Certified Copy of Policy at Form BP 00 06 01 97, p. 1 of 15), Capitol Indemnity argues that it can have no duty to defend Lorillard claims.  (Pl.'s Mem. at 6-10.)  The Policy makes clear that, however, if a suit brought against an insured seeks both compensatory and punitive or exemplary damages, Capitol Indemnity will "afford a defense" without rendering itself liable for the excluded punitive or exemplary damages.  (Certified Copy of Policy at Form CBP 179 (12-00).)  Thus, if Lorillard might recover compensatory damages at trial, the Policy requires Capitol Indemnity to provide a defense.

Lorillard does not directly demand compensatory damages as a remedy.  But Lorillard does seek punitive damages, among other equitable and monetary remedies.  (Lorillard Am. Compl. ¶ 86.)  In addition, in the underlying action, Lorillard requests that it "be awarded such other and further relief as this Court deems just and proper." (*Id.* ¶ 88.)  For Illinois common law claims, which Lorillard pleads, "punitive damages may not be recovered in the absence of compensatory damages." *Mitchell v. Elrod*, 275 Ill. App. 3d 357, 362, 655 N.E.2d 1104, 1108 (1st Dist. 1995); *see also Rice v. Nova Biomedical Corp.*, 38 F.3d 909, 919 (7th Cir. 1994) ("The basic rule in Illinois is that punitive or exemplary damages may not be awarded in the absence of actual damages. . . . This rule has been followed consistently in Illinois.") (citation omitted)*; In re Application of Busse*, 124 Ill. App. 3d 433, 443, 464 N.E.2d 651, 658 (1st Dist. 1984) ("Actual damage having been established to sustain the action for fraud, the trial court did not err in awarding judgment for

punitive and exemplary damages."). Construing the allegations of the Lorillard Amended Complaint liberally and drawing every inference in favor of the insureds, as the court must, Lorillard's claim for punitive damages and for miscellaneous relief could entitle it to recover compensatory damages. Accordingly, Capitol Indemnity has a duty to defend.

## III.    Duty to Indemnify

To the extent that Capitol Indemnity's declaratory action asks this court to rule on its duty to indemnify Elston or the Dukums in the underlying litigation, the court does not reach that issue. An "indemnification issue will become ripe only upon completion of the [underlying] litigation, for its resolution depends upon an analysis of the type of relief, if any, ultimately obtained in [the underlying] suit." *Pipefitters*, 976 F.2d at 1042. As the Seventh Circuit has made clear, forebearance is appropriate on the question of indemnity:

> A declaration that A must indemnify B if X comes to pass has an advisory quality; and if the decision would not strictly be an advisory opinion (anathema under Article III) it could be a mistake, because it would consume judicial time in order to produce a decision that may turn out to be irrelevant. Declaratory decisions about indemnity differ in this respect from the more common decision that an insurer has a duty to defend the client in ongoing litigation. Defense may be required even if there never turns out to be any liability to indemnify . . . .

*Lear Corp. v. Johnson Elec. Holdings Ltd.*, 353 F.3d 580, 583 (7th Cir. 2003). The court declines to resolve questions of indemnity at this stage.

## CONCLUSION

For the reasons explained above, Defendants Elston, Mike, Ibrahim, and David's Motion for Partial Summary Judgment [65] is granted, and the court enters a judgment that, as a matter of law, Capitol owes a duty to defend the underlying complaint. Plaintiff's Motion for Summary Judgment [69] is granted in part and denied in part. With regard to Capitol Indemnity's duty to defend, judgment is entered against Capitol Indemnity on Count I (seeking a declaration that the underlying lawsuit does not contain allegations that constitute advertising injury under the Policy); Count III (seeking a declaration that there is no coverage in the underlying lawsuit because every count of

Lorillard's Amended Complaint alleges intentional acts or false publications); and Count VI (seeking a declaration that the Policy's first-publication exclusion precludes coverage). Judgment is entered in favor of Capitol Indemnity on Count II (seeking a declaration that the underlying lawsuit does not contain allegations that constitute personal injury under the Policy). The court declines to rule on Capitol Indemnity's duty to indemnify Elston or the Dukums. Solely with respect to Capitol Indemnity's duty to defend, the court enters a judgment in favor of the Moving Defendants as to Count IV (in which Capitol Indemnity seeks a declaration that the Policy contains no coverage for the punitive or statutory damages Lorillard seeks) and Count V (which seeks a declaration that the Policy contains no coverage for the equitable relief Lorillard seeks). The cross-motions for summary judgment are otherwise denied.

ENTER:

Dated: March 13, 2008

_____
REBECCA R. PALLMEYER
United States District Judge